UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIMOTHY FADER,

        Plaintiff,

    v.
                                               Case No. 16-cv-1107-bhl

RICHARD J TELFER,
AMY EDMONDS,

        Defendants.

## DECISION AND ORDER

On May 1, 2014, the University of Wisconsin-Whitewater (UWW) featured prominently in the pages of the esteemed *Washington Post*. This upset the entire Whitewater community and was widely regarded as a disaster for the school. The relevant article, "55 Colleges Under Title IX Probe for Handling of Sexual Violence and Harassment Claims," listed UWW as a school the Department of Education's Office for Civil Rights was investigating for possible non-compliance. Nick Anderson, *55 Colleges Under Title IX Probe for Handling of Sexual Violence and Harassment Claims*, THE WASHINGTON POST, May 1, 2014. UWW Chancellor Richard Telfer probably expected to spend much of his summer managing fallout from the piece, but just two weeks later another potential scandal hit his desk. In mid-May, Telfer learned from Athletic Director Amy Edmonds that, in the preceding weeks, UWW head wrestling coach Timothy Fader had neglected to inform the school of new sexual assault allegations made by a former team manager. In a meeting with Telfer and Edmonds, Fader explained that he had taken the matter directly to the Whitewater police without notifying school authorities. The University responded by suspending Fader with pay and then declining to renew his contract the following month.

Fader believes he lost his job for circumventing the school's reporting system, thereby undermining UWW's ability to conceal the allegation. To hear him tell it, Telfer and Edmonds were desperate to avoid further controversy and scapegoated him to obscure Whitewater's deeper issues. Defendants categorically deny this and have moved for summary judgment on all counts.

Because the summary judgment record is insufficient to support Fader's claims, the Court will grant the motion.

## Factual Background

From 2004 to 2014, Timothy Fader was a lecturer and the head wrestling coach at the University of Wisconsin-Whitewater. (ECF No. 40 at 3.) He worked on fixed-term, annual contracts that UWW renewed every year for a decade. (*Id.*) The wrestling team flourished under his leadership. In 2014, they finished as national runner up, and Fader was named d3Wrestle.com's National Coach of the Year. UNIVERSITY OF WISCONSIN-EAU CLAIRE, https://blugolds.com/sports/wrest/coaches/FaderTim?view=bio (last visited Oct. 12, 2021).

Fader's tenure was not without issues, though. In an otherwise glowing April 2012 performance evaluation, then-Athletic Director Paul Plinske noted that "[b]etter awareness and compliance to NCAA rules and regulations will help Tim and his program." (ECF No. 47 at 10.) And in January 2013, Fader learned that the City of Whitewater Police Department was investigating one of his wrestlers, Justin Birschbach, in connection with an alleged sexual assault. (*Id.*) But these problems seemed to pass without causing major problems for Fader. He promptly informed then-Assistant Athletic Director Amy Edmonds of the Birschbach investigation, and none of the concerns over his NCAA rule compliance were so serious as to justify non-renewal of his contract. (*Id.* at 10-12.)

Just over a year after the Birschbach incident, another sexual assault allegation arose concerning the UWW wrestling team. On April 18, 2014, Fader received a phone call from the mother of G.L., a former UWW student and wrestling team manager. (*Id.* at 12-13.) G.L.'s mother informed Fader that a wrestling recruit, D.G., had sexually assaulted G.L. during his campus visit. (*Id.* at 13.) Fader reported the allegation to the City of Whitewater Police Department. (*Id.*) The police asked Fader to bring the accused down to the station. (*Id.*) Because he was with his children at the time, Fader phoned Demond Carter, a former wrestler who volunteered with the team, and instructed him to take D.G. in. (*Id.*) Fader later learned from a detective that D.G. had been compliant and no charges would be filed against him. (ECF No. 40 at 14.)

Unlike the Birschbach allegations, Fader never informed UWW of the accusations against D.G., even though his job duties required it. (*Id.* at 15.) According to an October 2013 memo distributed by Dean of Students Beth Mackin, Fader's job responsibilities made him a "Campus Security Authority" (CSA), who was required to report certain crime data under the Jeanne Clery

Disclosure of Campus Security Policy and Campus Crime Statistics Act (Clery Act). (ECF No. 47 at 2-3.) At UWW, CSAs were required to report sexual assaults to the Dean of Students' office, which Fader did not do. (*Id.* at 3 & ECF No. 40 at 15.)

The Dean of Students eventually learned of G.L.'s allegations and, on May 9, 2014, Mackin called Edmonds and informed her of the situation. (ECF No. 47 at 14.) Edmonds then relayed the information to Chancellor Richard Telfer and recommended that he meet with Fader. (*Id.*) Prior to the meeting, Edmonds also spoke to Fader. (*Id.*) She warned him, "[w]e could both lose our jobs over this." (*Id.* at 15.)

On May 12, 2014, Telfer, Edmonds, and Fader met to discuss the G.L. allegations. (*Id.*) Telfer asked Fader to explain why he had not reported the incident to Edmonds. (*Id.*) Fader responded that he did not know he was supposed to. (*Id.* at 15-16.) Telfer expressed displeasure at this, though he later told Fader that he applauded him for taking the accused to the police and called him a great wrestling coach with high values. (*Id.* at 16.) At the meeting's conclusion, Telfer announced that he was suspending Fader with pay and temporarily halting recruitment for the wrestling program. (*Id.* at 17.) Telfer also ordered Fader to complete a human resources sexual assault report training. (*Id.*)

On May 14, 2014, Telfer distributed an email to university contacts announcing his decision to suspend Fader and open an investigation into the wrestling team's recruitment practices. (ECF No. 40 at 24.) Although the G.L. incident prompted the investigation, the investigators did not look into her allegations. (ECF No. 47 at 19-20.) They did, however, schedule and complete about 50 interviews between May 13 and May 21. (ECF No. 40 at 27.) In the process, they uncovered several potential NCAA and Wisconsin Intercollegiate Athletic Conference (WIAC) recruiting violations, though all were of the lesser, secondary type. (*Id.* at 27-28.) Ultimately, nothing in the report led to sanctions from either the NCAA or WIAC. (ECF No. 47 at 25.)

Telfer, Edmonds, and Fader met again on June 9, 2014. (*Id.* at 21-22.) The parties discussed both the G.L. and Birschbach incidents, and Edmonds told Telfer that she did not recall[1] Fader's informing her of the Birschbach incident. (*Id.* at 22.) Though Fader's fate was ultimately in Telfer's hands, he solicited Edmonds' opinion. (*Id.* at 22-23.) She argued for non-renewal

---

[1] The parties conceded that Edmonds' recollection was incorrect, and that Fader did report that incident to her. (ECF No. 47 at 10.)

because she thought Fader's refusal to acknowledge his mistake portended future trouble. (ECF No. 40 at 29.) Telfer himself also expressed concern over Fader's failure to report the G.L. incident to anyone at UWW. (*Id.* at 30.) Thus, on June 10, 2014, Telfer informed Fader that his contract would not be renewed and gave him the opportunity to resign. (ECF No. 47 at 23-24.)

In July 2014, Fader emailed Telfer and apologized for not reporting G.L.'s accusation to the Dean of Students' office. (ECF No. 40 at 34.) But this did not alter his employment status with UWW. Following his non-renewal, Edmonds provided Fader with a proposed letter of reference. (ECF No. 47 at 26.) The letter praised him as a coach and stated, "Tim has become more disciplined with problems within the program. He seems to address issues quicker. He does need to continue to be aware of compliance with NCAA and conference rules to keep the program in a healthy state." (*Id.*) Both Edmonds and Telfer agreed that the letter fairly reflected Fader's performance and qualifications. (*Id.*) When Jim Schmidt, the Chancellor at University of Wisconsin-Eau Claire, contacted Telfer, the latter told him the Fader was a good wrestling coach, but he had concerns. (*Id.* at 26-27.) He suggested that if Eau Claire hired Fader, the athletic director would have to pay attention to what he did. (*Id.*) Eau Claire ultimately hired Fader in September 2015. (ECF No. 40 at 3.)

## SUMMARY JUDGMENT STANDARD

"Summary Judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact." *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(c)). Material facts are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). But "'speculation is not sufficient to survive summary judgment.'" *Khungar v. Access Community Health Network*, 985 F.3d 565, 573 (7th Cir. 2021) (quoting *Piotrowski v. Menard, Inc.*, 842 F.3d 1035, 1039 (7th Cir. 2016)). "'[T]here must be evidence." *Khungar*, 985 F.3d at 573 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

# ANALYSIS

In his complaint, Fader alleges First Amendment retaliation, wrongful termination, and defamation claims against Telfer and Edmonds in their individual capacities. (ECF No. 1 at 13-14.) The Court will take these claims in turn.

## I. Fader Has Not Established a Prima Facie Case of First Amendment Retaliation.

To set forth a prima facie case of First Amendment retaliation, the plaintiff must show that: "(1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter free speech, and (3) his speech was at least a motivating factor in the employer's action." *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). For the purposes of Defendants' motion, only the third element is at issue. Thus, for his claim to survive, Fader needs to come forward with evidence that his protected speech was a motivating factor in the Defendants' retaliatory action.

With respect to a retaliation claim, the Seventh Circuit has explained the motivating factor analysis does not require a plaintiff to show that retaliation was a "but-for factor or . . . the only factor, but is rather a factor that motivated the defendant's actions." *Spiegla v. Hull*, 371 F. 3d. 928, 942 (7th Cir. 2004). "'[T]he employee must show that the protected speech caused, or at least played a substantial part in, the employer's decision' to take adverse employment action against the plaintiff." *Id.* at 943 (quoting *Klunk v. County of St. Joseph*, 170 F.3d 772, 775 (7th Cir. 1999)). In other words, the plaintiff needs to produce evidence that his speech was a "sufficient condition . . . of the employer's decision to take retaliatory action against him." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012) (internal citation omitted). Circumstantial evidence of this causal relationship "'may include suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other employees in the protected group.'" *Id.* at 966 (quoting *Long v. Teachers' Retirement Sys. Of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009)).

Here, Fader confuses the hypothetical for the circumstantial. He articulates a covert plot whereby Telfer, Edmonds, and Mackin conspired to suppress dissemination of accurate sexual violence statistics. (ECF No. 38 at 12-15.) They bottlenecked sexual assault reports in the Dean of Students' office where Mackin controlled the narrative and flow of information. (*Id.*) Fader, in the role of Frank Serpico, subverted this scheme when he took G.L.'s allegations directly to the City of Whitewater Police Department. (*Id.*) This protected speech would be his undoing. Furious that Fader had outmaneuvered them, Telfer and Edmonds dismissed and defamed him. (*Id.*)

This narrative is not inconceivable, but it is wholly unsupported by evidence. Indeed, the record is bare of any indication that Telfer or Edmonds decided not to renew Fader's contract because of his protected speech. To the contrary, the uncontradicted evidence is that they decided not to renew Fader's contract because he failed to report a sexual assault through the appropriate university channels as required by university policy and federal law.

Fader argues that he has presented a "chronology of events from which retaliation could be inferred." *See, e.g.*, *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009) (granting Mays' inference of retaliation based on the chronology). Fader's suggested inference, however, is not one that a reasonable jury could make on the record at hand. The Seventh Circuit has confirmed that drawing an inference of retaliation based on a chronology requires something more than mere speculation. *See Marshall v. Knight*, 445 F.3d 965, 971 (7th Cir. 2006); *Chatman v. Pierce*, 583 F. App'x. 548, 550 (7th Cir. 2014); *Mays*, 575 F.3d at 650. Fader asks the Court to infer that, rather than opting not to renew his contract because he failed to alert them of G.L.'s sexual assault claim, Telfer and Edmonds terminated him because he reported the allegation to city police. But nothing in Fader's chronology of events indicates that Telfer or Edmonds were or would have had any reason to be upset about his reporting G.L.'s sexual assault allegation to the police. In fact, Telfer explicitly praised him for doing so. (ECF No. 47 at 16.) Although Fader alleges that Telfer and Edmonds wanted to smother G.L.'s complaint in the Dean of Students' office to avoid public scrutiny, this is purely speculation, "and speculation is not sufficient to survive summary judgment." *Piotrowski*, 842 F.3d at 1039.

Fader's attempts to bolster his conspiratorial speculation are unavailing. He points to Telfer's references to a 2007 University of Colorado Title IX case that ended with a $2.5 million settlement and the Chancellor's resignation. (ECF No. 38 at 9, 12-13.) He underscores Telfer's comments that the *Washington Post* story made UWW look bad. (*Id.* at 12.) He ponders the suspicious timing of the non-renewal decision—24 hours after Telfer learned that local media was sniffing around the G.L. case. (*Id.* at 13-14.) He asks why Telfer wrote a June 9 note containing the phrase, "sit down with Birschbach," over a year after the police investigation into Birschbach began. (*Id.* at 13; ECF No. 47 at 21.) But even taken in the light most favorable to Fader, none of this proves that his reporting of the assault to the police and the subsequent adverse employment action he suffered were at all causally related. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("To demonstrate the requisite causal connection in a retaliation claim,

plaintiffs must show 'that the protected activity and the adverse action were not wholly unrelated.'")

Highlighting the temporal proximity of his protected speech and the adverse employment action he suffered is the closest Fader comes to pleading genuine circumstantial evidence of retaliation. Three days after learning of his police report, Telfer suspended Fader with pay, and less than a month later, he non-renewed him. In the Seventh Circuit, "'a plaintiff may establish . . . a [causal] link [between protected expression and adverse action] through evidence that the discharge took place on the heels of protected activity.'" *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998) (quoting *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994). However, temporal proximity is "rarely . . . sufficient in and of itself to create a triable issue." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). Moreover, "'an employee's complaint . . . does not immunize [him] from being subsequently disciplined or terminated for inappropriate workplace behavior.'" *Kidwell*, 679 F.3d at 967 (quoting *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002)). "[W]here a 'significant intervening event separate[s]' an employee's protected activity from the adverse employment action he receives, a suspicious-timing argument will not prevail." *Kidwell*, 679 F.3d at 967 (quoting *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011)).

Fader not only commits a cardinal sin of logic (*post hoc ergo propter hoc*), but he also obfuscates the most rational explanation for his termination: departure from university procedure. Regardless of its Clery Act reportability, UWW policy *required* Fader to report G.L.'s allegations to the Dean of Students' office. (ECF No. 40 at 6.) He did not do so. Fader's protected police report did not immunize him from discipline for this subsequent indiscretion. *See Davis*, 651 F.3d at 675. If it did, employees could achieve permanent job security simply by starting each workday with a protected utterance.

And consciously or not, Fader has acknowledged that he acted improperly and that such improper action motivated the non-renewal decision. In July 2014, he admitted that failing to report the G.L. allegation was a mistake. *See Kidwell*, 679 F.3d at 967 (holding that Kidwell's admission of fault undercut an inference of retaliation). Further, during his deposition, Fader asserted that Telfer retaliated against him "[f]or not bringing the assault to the school," not for reporting it to the police. (ECF No. 34 at 9-10.)

Thus, despite Fader's suspicions, the record indicates that Telfer and Edmonds acted not because of his protected speech but because he did not speak when university policy required him to do so. Consequently, he cannot show that his protected speech was a sufficient condition that motivated his non-renewal, and therefore cannot make out a prima facie case of retaliation.

**II.     Because Fader's Lone Federal Claim Fails, The Court Will Not Exercise Supplemental Jurisdiction Over His State Law Wrongful Termination and Defamation Claims.**

"'[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.'" *Davis v. Cook Cty.*, 534 F.3d 650, 654 (7th Cir. 2008); *see Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 896 (7th Cir. 2001) (holding that while the district court could have exercised supplemental jurisdiction over state law claims after dismissing all federal claims, it was not required to do so). Following dismissal of his First Amendment retaliation claim, Fader retains only two claims—wrongful termination and defamation—both arising under Wisconsin state law. Thus, per the general rule, this Court will decline to exercise supplemental jurisdiction over those remaining claims.

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment under Fed. R. Civ. P. 56 (ECF No. 31) is GRANTED with respect to Count I First Amendment Retaliation. The Court declines jurisdiction over Count II Wrongful Termination and Count III Defamation, and the case is DISMISSED.

Dated at Milwaukee, Wisconsin on October 27, 2021.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge